**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

**Civil Case No.: 3:22-cv-00248-BJD-JBT**

**ROYAL ROSE**, on behalf of himself and all others similarly situated,

Plaintiff,

v.

**MYCOMPUTERCAREER, INC.**,

Defendant.

**MYCOMPUTERCAREER'S OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS COUNTERCLAIM, OR STRIKE PRAYER FOR ATTORNEY'S FEES, AND MOTION FOR SANCTIONS**

Counterclaim-Plaintiff MyComputerCareer, Inc. ("MCC"), through counsel, files this Opposition to Counterclaim-Defendant Royal Rose's Motion to Dismiss Defendant's Counterclaim, or Strike Prayer for Attorney's Fees, and Motion for Sanctions (ECF No. 11).

## INTRODUCTION

Notably absent from Mr. Rose's Motion is any attempt to engage the actual allegations underlying MCC's counterclaim. That is, Mr. Rose starts from the false premise that MCC's calls responding to his inquiry were somehow telemarketing. But the facts as alleged by MCC, and as ignored by Mr. Rose, are that this case arises from two voicemail messages an MCC representative left for Mr. Rose in direct response to the inquiry he initiated, and in order to complete the free career evaluation he specifically requested. Countercl. ¶¶ 9-21. Simply

put, as the FCC and numerous courts have held, telemarketing does *not* include calls "made in direct response to written and oral requests." *Newhart v. Quicken Loans Inc.*, No. 9:15-CV-81250, 2016 WL 7118998, at *4 (S.D. Fla. Oct. 12, 2016). Mr. Rose's Motion is therefore a 15-page straw man argument attacking telemarketing calls MCC did not place.

Notably present in Mr. Rose's Motion are characterizations of the case law supporting MCC's request for attorneys' fees that are verifiably false. For example, Mr. Rose asserts that the cases MCC disclosed prior to the filing of his Motion only supported "claims for 'costs' [and] not 'fees' as sought by Defendant here." Mot. at 13.[1] But the defendants in these cases were unambiguously allowed to pursue the "costs associated with ***defending***" the same type of setup lawsuits – expressly including their "attorneys' fees and other litigation expenses."[2] As further detailed below, numerous courts across the country, including in this district, have held that a plaintiff can be liable for attorneys' fees when those fees are direct or consequential damages resulting from a breach of an agreement whose very purpose was to preclude the basis of the plaintiff's

---

[1] *Citing Franklin v. Upland Software, Inc.*, No. 1-18-CV-00236-LY, 2019 WL 433650, at *4 (W.D. Tex. Feb. 1, 2019), report and recommendation adopted, No. 1:18-CV-236-LY, 2019 WL 2745748 (W.D. Tex. Mar. 12, 2019) (upholding counterclaim against TCPA plaintiff which sought defense "costs associated with what [defendant] views as a spurious and setup lawsuit."); and *Cunningham v. USA Auto Prot., LLC*, No. 4:20-CV-142-RWS-KPJ, 2021 WL 434243, at *2 (E.D. Tex. Jan. 8, 2021), report and recommendation adopted, No. 420CV00142RWSKPJ, 2021 WL 425100 (E.D. Tex. Feb. 8, 2021) (permitting counterclaim that sought the defendant's defense costs to proceed against TCPA plaintiff alleged to have requested the calls he later sued about).

[2] *Cunningham*, 2021 WL 434243, at *2; *see also* Answer and Countercl. at 21 (ECF No. 34) (filed May 18, 2020).

suit. Put differently, attorneys' fees are allowable in situations where such damages would be necessary to make the claimant whole.

That is this case. Mr. Rose expressly invited MCC to call him – both in writing and orally – to conduct the free career consultation **he requested**. By then suing MCC for the calls placed to complete his request, Mr. Rose directly breached the Opt-In Policy he agreed to, and on which MCC detrimentally relied as a condition of calling him back. In these circumstances, MCC's counterclaim properly "seeks attorney's fees as a consequence of the [] Plaintiffs' breach of the [] contract." *Gregoire v. Lucent Tech., Inc.*, 6:03-CV-251ORL31KRS, 2005 WL 1863429, *3 (M.D. Fla. Aug. 5, 2005) (holding that American Rule does not apply where counterclaim arises from breach of agreement whose very purpose was to avoid the dispute at issue; in such cases, attorneys' fees defending suit are permissible measure of damages).

## BACKGROUND

### A. The Telephone Consumer Protection Act

Under the TCPA subsection at issue here, only calls initiated using a prerecorded voice require some form of consent if placed to a wireless telephone number, with the form of consent dependent on the nature of the call. *See* 47 U.S.C. § 227(b); 47 C.F.R. § 64.1200(a)(1) (prerecorded **informational** calls to wireless numbers subject to prior express consent); 47 C.F.R. 64.1200(a)(2) (prerecorded **telemarketing** calls subject to prior express ***written*** consent). Any calls that are not initiated "using an [autodialer] or an artificial or

prerecorded voice" fall outside subsection (b) entirely.

It is therefore critical to understand what is, and what is not, a telemarketing call. The term "telemarketing" is defined to mean "a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 C.F.R. § 64.1200(f)(12). The term "advertisement" is defined as "material advertising the commercial availability or quality of any property, goods, or services." *Id.* at § 64.1200(f)(1). Any calls that do not introduce an advertisement or do not constitute telemarketing are considered informational calls, and would require, at most, "prior express consent" – which is satisfied simply by someone knowingly giving their number to the caller.[3]

To put some further commonsense guardrails around the TCPA, the FCC further clarified that calls "whose purpose is to facilitate, complete, or confirm a commercial transaction that the recipient has previously agreed to enter into with the sender are not advertisements," but are transactional/informational messages.[4] That is, "communications sent to facilitate" a transaction "a customer has agreed to take or is in the process of negotiating is not" telemarketing. *Id.* Similarly, where a business responds to a consumer inquiry, such as by providing

---

3 *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report and Order, 7 FCC Rcd. 8752, ¶ 31 (Oct. 16, 1992); *see also, e.g., Roberts v. PayPal, Inc.*, No. C 12-0622 PJH, 2013 WL 2384242, *5 (N.D. Cal. May 30, 2013) ("the court finds that plaintiff consented to receive text messages from PayPal simply by providing his cell phone number").

4 *See In re Rules & Regs. Implementing the Tel. Consum. Prot. Act of 1991*, 21 FCC Rcd. 3787, 3812 ¶ 49 (2006).

a requested coupon, such messages constitute the "fulfillment of the consumer's request and thus does not constitute a telemarketing communication."[5]

Telemarketing thus does not include calls "made in direct response to written and oral requests." *Newhart*, 2016 WL 7118998, at *4. "Such invited calls are not unsolicited telemarketing calls 'initiated' for the purpose of marketing a good or service." *Id.* (citing 47 C.F.R. § 64.1200(f)(12)); *see also Jacobs v. Quicken Loans, Inc.*, No. 15-81386-CIV, 2017 WL 4838567, at *3 (S.D. Fla. Oct. 19, 2017), reconsideration denied, 2017 WL 8751757 (S.D. Fla. Dec. 6, 2017) ("calls [defendant] made were in response to requests" and "[o]ther telephone calls were follow-up calls regarding" consumers' applications, and thus "did not constitute telemarketing."); *Wick v. Twilio Inc.*, No. C16-00914RSL, 2017 WL 2964855, at *5 (W.D. Wash. July 12, 2017) (message received was aimed at completing commercial transaction that the plaintiff initiated and thus the message did not constitute telemarketing).

**B. MCC's Allegations**

On August 27, 2021, Mr. Rose submitted an application through MCC's website specifically requesting that MCC call him to conduct a free career evaluation consultation. Countercl. ¶ 12. Individuals specifically interested in MCC's educational programs first conduct an initial online assessment that allows a MCC representative to gauge the individual's current IT proficiency. *Id.* ¶ 11. A MCC representative will then use the results of the initial assessment as

---

5 *See In re Rules & Regs. Implementing the Tel. Consum. Prot. Act of 1991*, 30 FCC Rcd. 8020, ¶ 104 (2015).

part of the free career consultation – the purpose of which is to discuss the individual's test results, his or her specific career goals, and to provide tailored information on MCC's courses that would help achieve that individual's particular career goals as quickly as possible – all at the individual's express request to receive such information as part of the application process. *Id.* ¶ 11.

If an individual like Mr. Rose chooses to complete and submit a Free Career Evaluation Form through MCC's Website, they do so with clear notice that their inquiry is subject to MCC's Opt-In and Privacy Policy ("Opt-In Policy") linked directly below the "Submit" button. *Id.* ¶ 13. In order to avoid disputes such as this one, the Opt-In Policy makes clear that both parties are agreeing that the individual's submission "constitutes an inquiry and/or application" under federal and state law, and the individual consents to MCC responding to the individual through various telephonic means. *Id.* ¶ 14. Mr. Rose agreed to the Opt-In Policy and knowingly released his telephone number to MCC as part of his request to MCC to provide him the free career evaluation and consultation. *Id.* ¶¶ 12, 15.

The next day, a MCC representative called Mr. Rose in response to his inquiry, but he indicated he was busy at that moment, and again requested that MCC call him back later. *Id.* ¶ 16. Relevant here, a MCC representative attempted to call Mr. Rose back two more times, on September 1 and 4, 2021, in order to conduct the free career evaluation consultation he requested. *Id.* ¶¶ 18-19. But when these two calls went unanswered, the MCC representative left Mr.

Rose a voicemail message both times requesting that Mr. Rose call the representative back to complete the free career evaluation he requested. *Id.* When Mr. Rose did not respond to these two voicemails his application prompted, MCC made no further attempts to contact Mr. Rose and moved on. *Id.* ¶ 21. Unfortunately for MCC, Mr. Rose did not, filing this putative TCPA class action nearly six months after Mr. Rose actively solicited the two voicemails he now complains about.[6]

### C. Mr. Rose Ignores or Mischaracterizes MCC's Allegations

Mr. Rose and his counsel appear to fundamentally misunderstand the purpose of a motion to dismiss: testing whether a claimant's ***factual allegations***, accepted as true, state a claim for relief that is plausible on its face. Mr. Rose's entire Motion, in contrast, tests whether ***his unsupported legal conclusion*** – that the two voicemails MCC left for Mr. Rose are telemarketing (because he says so) – can defeat MCC's counterclaim for breach of contract.[7] This bears repeating: **at no point** does Mr. Rose address the actual allegations lodged by MCC demonstrating the real reason a MCC representative left him the two voicemails at issue -- so that MCC could complete the free career evaluation

6 Mr. Rose requests injunctive relief in his Complaint, even though MCC has made no further attempts to respond to his inquiry in the last 7 months. Compl. ¶ 5. Ironically, Mr. Rose is the party moving for sanctions on the (meritless) grounds that *MCC* is requesting relief it is not entitled to. Mr. Rose and his counsel respectfully should not be throwing rocks from their glass house.

7 Mr. Rose's entire Motion is effectively one long logical fallacy of begging the question. That is, he needed to establish that *MCC's allegations* demonstrate that MCC was engaged in telemarketing. Instead, he simply assumes that to be the case, and then concludes with the *non sequitur* that his unsupported legal conclusion somehow cancels out MCC's independent breach of contract counterclaim.

consultation he expressly requested as part of the application he submitted. Countercl. ¶¶ 9-21.

While this fundamental deficiency is fatal to Plaintiff's Motion by itself, it must also be noted that where Mr. Rose ostensibly attempts to address the "facts," they are falsehoods of his own creation that do not appear anywhere in MCC's Counterclaim. Mot. at 3. That is, Mr. Rose begins by counterfactually asserting that MCC "**forces consumers** to provide their telephone number to Defendant" and "the submission of their telephone number [sic] is **not voluntary**." *Id.* (emphasis added). These false assertions outside of MCC's counterclaim are improper in a motion to dismiss. The facts as alleged, and in reality, are that no one forced Mr. Rose to submit an application or request a free career evaluation from MCC through its website.[8] Mr. Rose could have simply called or emailed MCC at the separate telephone number or email address provided on MCC's website if he did not want to submit his inquiry through this method.

Instead, as alleged by MCC, and which Mr. Rose completely fails to address, he knowingly released his telephone number to MCC, and specifically invited MCC to call him to complete the free career evaluation he requested, subject to the Opt-In Policy. These are the only allegations that matter.

---

[8] MCC suspects Mr. Rose's counsel would not take the same position that he "forces" consumers to provide their contact information on his website, along with an "involuntary" agreement that "By submitting this form, you understand that Eisenband Law, P.A. may contact you by telephone or email." *See* https://eisenbandlaw.com/contact-us. Juris doctor, heal thyself.

# DISCUSSION

## A. MCC's Counterclaim Sufficiently Alleges a Breach of Contract

### 1. Mr. Rose Bound Himself To MCC's Opt-In Policy

Plaintiff and MCC became parties to a binding contract at the moment Plaintiff voluntarily submitted his personal information into the Free Career Evaluation Form on MCC's website. While Mr. Rose does not appear to seriously argue he did not bind himself to MCC's Opt-In Policy, for the avoidance of doubt, numerous courts have recognized the validity and legal enforceability of "click-through" agreements, which constitute binding contracts under the allegations here. *See, e.g., Exceptional Urgent Care Center I, Inc. v. Protomed Medical Management Corp.*, 2009 WL 2151181, n.7 (M.D. Fla. July 13, 2009) ("Click agreements are valid agreements governed by ordinary principles of contract law that typically require a computer user to read the agreement on the computer's monitor and click 'I accept' before proceeding to the next screen and/or obtaining additional information.").[9]

More specifically, every potential applicant, including Mr. Rose, who accesses MCC's website and wishes to request a free career consultation and

[9] Click-through agreements "require a user to affirmatively click a box on the website acknowledging awareness of, and agreement to the terms of service before he or she is allowed to proceed with further utilization of the website." *Berkson v. Gogo LLC*, 97 F.Supp.3d 359, 397 (E.D.N.Y. 2015). "By requiring a physical manifestation of assent, a user is said to be put on inquiry notice of the terms assented to." *Id*. "For this reason, courts typically find such agreements to be enforceable." *Wilson v. Kellogg Co.*, 111 F. Supp. 3d 306, 313 (E.D.N.Y. 2015). This legal doctrine arose because, "[w]hile new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004).

further information about MCC's various programs is presented with a simple form to input their personal information. Countercl. ¶ 13. Importantly, every customer is also provided with a disclaimer at the bottom of the form which states "[b]y entering your information, you are agreeing to our Opt-In and Privacy Policy." This language is located directly below the "Submit" button, where it is clearly visible to the customer, and the phrase "Opt-In and Privacy Policy" is a hyperlink which, if clicked, takes the customer to a separate page containing the language of the policy.[10]

In this case, Plaintiff accessed MCC's website and entered his personal information into the Free Career Evaluation Form. Once he clicked the "Submit" button and requested career advice from MCC, he affirmatively manifested his intent to be bound by the terms of the Opt-In and Privacy Policy. *See Temple v. Best Rate Holdings LLC*, 360 F. Supp. 3d 1289, 1304 (M.D. Fla. 2018) ("[W]here the website user was cautioned that clicking the 'Sign Up' button indicated his agreement to the Terms of Service, here, Plaintiff was cautioned that clicking the "Get a Quote" button would indicate his acceptance to the Agreement available via the Terms and Conditions Hyperlink."). MCC detrimentally relied upon Plaintiff's acceptance of the Opt-In Policy, *see Pinnacle Port Community Ass'n, Inc. v. Orenstein*, 872 F.2d 1536, 1544 (11th Cir. 1989) ("Detrimental reliance is

[10] Courts have consistently held that only the link to a policy's language need be clearly displayed to a consumer, not that the relevant language itself be readily apparent within the entirety of the terms and conditions. *See Arencibia v. AGA Service Co.*, 533 F. Supp. 3d 1180, 1189-90 (S.D. Fla. 2021) (an individual is considered on "inquiry notice" if "the hyperlink to the terms and conditions is conspicuous enough to put a reasonably prudent person" on such notice). Plaintiff conflates these two distinct concepts by accusing MCC of "hiding" and "burying" the relevant disclosure language within the full Opt-In and Privacy Policy. Mot. at 4-5.

valid consideration for a contract."), and thus, a "click-through" contract was formed between the parties.

**2. Plaintiff's Unsupported Legal Conclusion Provides No Basis to Set Aside The Parties' Agreement at the Pleadings Stage**

Without stating as much, or providing any case law in support of such a proposition, Mr. Rose's argument appears to be that the Parties' agreement is somehow invalidated by the FCC's (inapplicable) regulations regarding prerecorded telemarketing calls. As already established, however, Mr. Rose entirely fails to carry his burden of establishing that the two voicemail messages at issue could possibly be considered telemarketing under the facts alleged and the FCC's binding precedent and case law detailed above. The facts here squarely establish that the communications at issue were placed to "facilitate, complete, or confirm a commercial transaction that the recipient has previously agreed to enter into" – that is, to conduct the free career consultation Mr. Rose specifically requested.[11]

In addition to the FCC orders and Florida federal case law detailed above, numerous other courts across the country have rejected claims that messages sent in response to a consumer inquiry could be considered telemarketing. For example, in *MacKinnon v. Hof's Hut Rests., Inc.*, No. 2:17-cv-01456-JAM-DB, 2017 WL 5754308, at **2-3 (E.D. Cal. Nov. 28, 2017), the court held that it was "common sense" that a text message containing a link to a restaurant's menu was

---

[11] *See In re Rules & Regs. Implementing the Tel. Consum. Prot. Act of 1991*, 21 FCC Rcd. 3787, 3812 ¶ 49 (2006).

not telemarketing because "Plaintiff initiated the dining transaction by making a reservation at Defendant's restaurant." In *Pietzak v. Microsoft Corp.*, CIV No. 15-5527-R, 2015 WL 7888408, at *2 (C.D. Cal. Nov. 17, 2015), the court ruled that "their claims fail because Microsoft's text messaging program complies with the TCPA. Plaintiffs voluntarily sought specific information about Microsoft's promotions, providing both their phone numbers and their express consent to receive that information by texting specific keywords from their mobile phones." In other words, someone cannot request information about a company's offerings, and then claim it is telemarketing when they receive that information in reply. *See also Daniel v. Five Stars Loyalty, Inc.*, No. 15-cv-03546, 2015 WL 7454260, at *5 (N.D. Cal. Nov. 24, 2015) (text message sent in response to plaintiff's "inquiry regarding [defendant's] program" was not telemarketing); *Wick*, 2017 WL 2964855, at *5 (ruling plaintiff agreed to website terms of service and "the text message he received was aimed at completing a commercial transaction that he had initiated and for which he had provided his phone number.").

At bottom, MCC's allegations clearly establish that the only reason a MCC representative contacted Mr. Rose was to respond to the application he submitted and for which he provided his phone number, for the express purpose of completing the free career evaluation he requested. Simply put, he received two informational voicemails in direct response to the application he submitted. Mr. Rose's failure to address these facts is fatal to his Motion.

### 3. MCC Has Adequately Alleged Damages, And It Is Entitled To Its Attorneys' Fees Under the Facts Alleged

Plaintiff argues that MCC failed to sufficiently allege damages. Notice pleading, however, does not require a party to provide a detailed accounting or even a precise amount of alleged damages. Rather, it is sufficient for the party to simply include facts that reasonably notify the opposing party of what the alleged damages are causally related to. *See Scarfato v. Nat'l Cash Register Corp.*, 830 F. Supp. 1441, 1442 (M.D. Fla. 1993) (allegation "that [party] suffered damages" as a result of opponent's negligent conduct was sufficient at pleadings stage). MCC has surpassed that threshold here, by including allegations describing the work expended by MCC employees in attempting to reach Plaintiff, *see* Compl. ¶¶ 16-19, in the Prayer for Relief, as well as the time and expenses MCC and its employees will need to expend on this lawsuit as it continues. In short, MCC has alleged sufficient damages separate and apart from the attorneys' fees it has also requested as a proper – and independent – measure of its damages in this case.

As to MCC's request for attorneys' fees, none of the case law relied upon by Plaintiff concerning the American Rule is pertinent here. *See* Mot. at 7-9.[12] MCC is not seeking an award of attorneys' fees only from the standpoint of a prevailing party, as the American Rule contemplates and precludes in that scenario. Rather, MCC's attorneys' fees here are a natural and inevitable consequence of Plaintiff's

---

[12] After citing a few distinguishable cases – **half of which were fraud cases** – Mr. Rose curiously argues that the decisions MCC's counsel provided before he filed his Motion are apparently distinguishable *because* they involve fraud claims. Clearly, Mr. Rose cannot have it both ways, and the applicability – or inapplicability – of the American Rule does not depend on the exact claim at issue.

breach of the Opt-In Policy – the whole point of which was to preclude a dispute such as this one.

In the directly analogous case from this district highlighted above, *Gregoire,* the defendant had entered into a straightforward, "voluntary termination offer" ("VTO") agreement with its union member employees. *Gregoire*, 2005 WL 1863429, *1. Through the VTO, the plaintiffs agreed to leave the defendant's "service voluntarily, in exchange for the right to receive a lump sum payment," provided they relinquish various rights under their collective bargaining agreement with the defendant. *Id.* When those employees who agreed to the VTO later sued to enforce those same relinquished rights, however, the defendant counterclaimed for breach of contract and successfully sought its attorneys' fees for having to defend claims the VTO was designed to prevent: "In essence, [defendant] asserted that the VTO [was] a contract, the intent of which was that, in exchange for receiving the VTO, benefit payments, the VTO Plaintiffs released any claim to benefits under [their collective bargaining agreement], and thereby agreed 'not [to] file an action in court seek to obtain any of those benefits." *Id.* at 2.

As Judge Presnell ruled, the American Rule in no way bars a claimant from seeking its attorneys' fees that are incurred defending a "claim filed in breach of an agreement which the defendant asserted that it entered specifically to avoid the cost of litigation." *Id.* at 5 (citing numerous cases permitting claims seeking attorneys' fees where party breached agreement, the purpose of which was to

preclude dispute at issue). *Gregoire* is thus fully consistent with a large body of decisions holding that attorneys' fees are an entirely proper measure of damages for a breach of contract claim where, like here, the central point of the agreement was frustrated by the plaintiff(s)' decision to effectively repudiate the agreement and sue the defendant in direct contravention of the underlying purpose of the agreement at issue.[13]

Thus, MCC's request for attorneys' fees is consistent with numerous TCPA decisions permitting defendants to seek their attorneys' fees defending suits where, like here, the plaintiff is accused of actively soliciting the calls he later sues about. Like *Cunningham* and *Franklin* detailed above, in *Miller v. 3G Collect, LLC*, 302 F.R.D. 333, 338-39 (E.D. Pa. Sep. 16, 2014), the court held that a breach of contract counterclaim against the plaintiff seeking attorneys' fees was a compulsory counterclaim and allowed the claim to proceed.

More recently, a federal court in Illinois both allowed a counterclaim seeking attorneys' fees to proceed ***and*** cursorily rejected the plaintiff's request

---

[13] *See, e.g., Anchor Motor Freight, Inc. v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., Loc. Union No. 377,* 700 F.2d 1067, 1072 (6th Cir. 1983) (overturning district court's decision not to allow defendant to pursue "costs and attorney fees … as a measure of the actual damages which [defendant] incurred in defending the lawsuit the plaintiff instituted purportedly in violation" of the parties' agreement); *Bolton v. McKinney*, 299 Va. 550, 556, 855 S.E.2d 853, 857 (2021) ("Allowing [attorneys' fees as] damages in this circumstance compensates the injured party for its loss and puts it back in the same position in which it would have been had the other party adhered to its promise."); *Zuniga v. United Can Co.*, 812 F.2d 443, 455 (9th Cir. 1987) (recognizing that American Rule does not apply where attorneys' fees are "principle elements of damages" that a party "was forced to expend" to defend its rights, and failure to allow attorneys' fees would leave party without proper remedy); *Susman v. Schuyler*, 328 So.2d 30 (1976) (recognizing that under Florida law, there are numerous instances where attorneys' fees are proper measure of damages, and ruling trial court erred in not allowing attorneys' fees incurred "as part of the costs of removing the cloud" from the claimant's title).

for sanctions. *See Anthony v. Federal Savings Bank*, No. 1:21-cv-02509 (N.D. Ill. March 30, 2022), ECF No. 74, at 10-11, 13. In *Anthony*, the plaintiff asserted that he never provided express written consent to receive phone calls from the defendant. *Id*. at 2. But the plaintiff was alleged to have accessed the defendant's website and entered his contact information, and the site's policy stated that "submit[ting] information" constituted express written consent under the TCPA. *Id*. The court refused to consider the sanctions request, finding it premature at the pleadings stage. *Id*. at 13. And just as importantly, the court permitted the defendant's counterclaim seeking attorneys' fees to proceed, ruling that the fees the defendant incurred "defending the manufactured lawsuit" were a proper measure of damages. *Id*. at 11.

Here, the whole point of MCC's Opt-In Policy was to remove any doubt that Mr. Rose was expressly agreeing to receive telephone calls in response to the inquiry he voluntarily submitted. That is, the purpose of the agreement was to allow MCC to confidently call Mr. Rose back without fear of being sued. MCC detrimentally relied on Mr. Rose's promise, and is incurring legal fees to defend itself in this lawsuit. Thus, in this case, as in the cases cited above, the central point of the agreement was frustrated by Mr. Rose's decision to renege and sue MCC, in direct contravention of the parties' agreement. And like the other claimants, MCC will not be made whole unless there is an award of attorneys' fees to compensate for the breach. For these reasons alone, the Court should reject Mr. Rose's request to strike MCC's request for attorneys' fees.

## B. Plaintiff's Request for Sanctions is Baseless and Improper

"A legal claim is frivolous if ***no*** reasonably competent attorney could conclude that it has ***any*** reasonable chance of success or [there] is a reasonable argument to change existing law." *In re Mad Toyz III, LLC*, 2021 WL 4843911, *2 (M.D. Fla. Sep. 14, 2021) (emphases added).[14] Given the overwhelming authority detailed above supporting MCC's counterclaim and request for attorneys' fees, it is objectively unreasonable for Mr. Rose to argue undersigned counsel has no reasonable chance of success prevailing on its counterclaim.

For the avoidance of doubt, and as a threshold matter, 28 U.S.C. § 1927 does not provide grounds for *MCC itself* to be sanctioned. The statute's language is limited to "[a]ny *attorney* or other *person admitted* to conduct cases," (emphasis added). Each § 1927 case relied upon by Plaintiff involved sanctions against attorneys.[15]

Further, 28 U.S.C. § 1927 contains an objective standard of reasonableness, allowing for sanctions only if a lawyer "multiplies the proceeding in any case unreasonably and vexatiously." Filing a counterclaim supported by ample legal authority – authority Mr. Rose had to misrepresent in order to distinguish – does not implicate that standard.[16] Indeed, Mr. Rose cites no controlling authority

---

14 "The Court's 'power to impose sanctions under Section 1927 should be exercised only in instances of a serious and studied disregard for the orderly processes of justice.'" *Smartt v. First Union Nat'l Bank*, 245 F. Supp. 2d 1229, 1235 (M.D. Fla. 2003) (quoting *Jerelds v. City of Orlando*, 194 F. Supp. 2d 1305, 1312 (M.D. Fla. 2002)).

15 Ironically, Mr. Rose should be sanctioned under his own standards, as he (unlike MCC) is requesting relief he is not entitled to.

16 Indeed, courts have held that even filing a *frivolous* case does not, in and of itself,

whatsoever to support *any* aspect of his Motion, whether to dismiss MCC's counterclaim, to strike MCC's request for attorneys' fees, or his demand for sanctions. Even if one were to ignore all the case law in MCC's favor, including all of the decisions that summarily denied a TCPA's plaintiff's request for sanctions *and* allowed counterclaims seeking attorneys' fees to proceed, Mr. Rose's inability to cite any controlling authority should end his baseless request for sanctions. *See Snow Ingredients, Inc. v. SnoWizard, Inc.*, 2014 WL 1329804, at *9 (E.D. La. Mar. 28, 2014) (denying motion for sanctions because, *inter alia*, Court of Appeals had never clearly foreclosed plaintiff's argument), *aff'd*, 833 F.3d 512 (5th Cir. 2016).

## CONCLUSION

Mr. Rose's counsel threatened MCC and its attorneys with sanctions in **under 15 minutes** after its Counterclaim was filed, Mot. Ex. 1, indicating the Motion was not conceived after careful consideration of the actual allegations MCC lodged to support its claim. As the saying goes, when all you have is a hammer, everything looks like a nail. And to TCPA plaintiffs, every call might sound like a telemarketing call, but that has never been the law when calls are placed in direct response to an inquiry the plaintiff himself initiates. In contrast, it is the law that MCC is entitled to its attorneys' fees incurred defending against

---

warrant sanctions under Section 1927. *See Gurman v. Metro Housing and Redevelopment Authority*, 884 F. Supp. 2d 895, 900 (D. Minn. 2012) ("[A]n attorney cannot be sanctioned under § 1927 for simply commencing a frivolous lawsuit."). However, it should be noted that the filing of an unwarranted motions for sanctions can itself be sanctionable. *See Grimsley v. Palm Beach Credit Adjusters, Inc.*, No. 15-81263-CIV, 2016 WL 269562, at *7 (S.D. Fla. Jan. 20, 2016) (noting that "frivolous motions" and "unwarranted attacks" are themselves sanctionable).

Mr. Rose's complete repudiation of the Opt-In Policy he indisputably agreed to, the express purpose of which was to avoid ill-conceived lawsuits such as this one. For these reasons, Mr. Rose's Motion should be denied in its entirety.

Dated: April 25, 2022

Respectfully submitted,

By: */s/ Mary Joanne Dowd*
Mary Joanne Dowd, # 368970
Adam Bowser, (*pro hac vice*)
Morgan R. Pankow, (*pro hac vice*)
**ARENTFOX SCHIFF LLP**
1717 K Street, N.W.
Washington, DC 20006-5344
(202) 857-6000 (telephone)
(202) 857-6395 (facsimile)
mary.dowd@afslaw.com
adam.bowser@afslaw.com
morgan.pankow@afslaw.com

*Attorneys for MyComputerCareer, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 25, 2022, the foregoing was filed electronically with the Clerk of Court to be served by Notice of Electronic Filing from the Court's electronic filing system upon the following:

Manuel S. Hiraldo, Esq.
HIRALDO P.A.
401 E. Las Olas Blvd.
Suite 1400
Ft. Lauderdale, FL 33301
Tel: (954) 400-4713
mhiraldo@hiraldolaw.com

Michael Eisesnband
EISENBAND LAW, P.A.
515 E. Las Olas Blvd.
Suite 120
Ft. Lauderdale, FL 33301
Tel: (954) 533-4092
meisenband@eisenbandlaw.com

*Attorneys for Plaintiff*

/s/ *Mary Joanne Dowd*
Mary Joanne Dowd